May it please the court, my name is Daniel Blank and I represent Marcel King in this case. I will endeavor to reserve two minutes for rebuttal. I think I'd like to begin with the probation search issue because the case law has developed since the briefing was completed. And I think I should talk a little bit about Baker. Baker is not controlling of this case, and I want to argue to the court why it's not. In Baker, the condition of probation was expressly articulated to the defendant that it was with or without reasonable suspicion. That's also true, by the way, in Sanchez v. Canales. In my client's case, it was with or without probable cause. And this distinction is important under both Sampson and Knights when the Supreme Court took into consideration what the person was advised of and noted that the fact, in those cases as well, the person was told that they could be searched with or without reasonable suspicion. That was a salient detail in figuring out whether they could do that. In one of the cases, maybe Knights, the language was with or without reasonable cause, I think. Correct. And in Knights itself, it interpreted that language to mean reasonable suspicion, with or without reasonable suspicion. It's in a footnote. Right. Just a little bit of an odd way. I mean, that made me think that they didn't really care what it said very much. And, frankly, Knights is now behind Sampson. I think Sampson is the more important one to look at because that's what Sanchez v. Canales relies on to say that there's some sort of bright-line test where probationers, parolees in Sampson, never need reasonable suspicion, and that's not correct. So your argument in this case is that reasonable suspicion is required, correct? It is. So once again, echoing something that Judge Tolman asked in the previous case, if we were to conclude that reasonable suspicion existed here, then we wouldn't have to entertain we could assume that as a legal proposition without entertaining the details of the argument that leads you there. So what I would appreciate is your explaining why there was not a reasonable suspicion to search the residence of the defendant's mother. Yes, Your Honor. Reasonable suspicion, this Court has held, requires more than a hunch or a lead or a bare accusation or a gossip or rumor, and that's exactly what we had here. There was suspicion, but it wasn't reasonable. And it's an objective test. This Court has set forth numerous factors to consider. The first one is whether the tip by a non-anonymous informant was against penal interest, and it clearly was not in this case. And then we look to other factors like whether it was face-to-face, whether the tippee or tipper has a history of truthfulness, whether it contained predictive information, whether it was close in time to the observations, and whether it knowingly reveals the source. The government relies exclusively on CW1, and I apologize. The record in this case is very murky. I did my best to try to sort it out for the Court. But what we have here are multiple levels of hearsay. CW1 is the one who actually talked to the officer. But hearsay is permissible, is it not, in the reasonable suspicion calculation? It is, but you still need to look at all the links in the chain of the hearsay to see if it's reliable or not. And CW1 clearly knew Marcel because CW1 took the police to the house. Not only knew him, but was biased against him. And Judge Alsop, in the finding that he made, found that CW1 was biased and actually discounted CW1's reliability for that reason. There's a history of family feuding between the family of CW1 and the family of my client. But the issue that I think we're trying to examine here is not what his motivation might have been, but whether or not he had a basis to know King. And there isn't any question that CW1 knew Marcel King. There are a couple of issues. One is, can they identify the person, but also the reliability of that person's information and the fact that they knew him. But I don't really see whether he knew King has to do with it. The question is whether he had any – he had third-level hearsay about whether King was involved in this murder, which is the only thing that matters. I mean, right? I mean, everything after that, I mean, they did a nice job of finding who King was and finding him and ascertaining where he lived and so on. I mean, that's all fine, as far as I can tell. The question is the connection of King to the murder. Exactly. And you have to then look at the reliability of the source, the eyewitness, and that's where things get very murky, because none of the factors that this Court has set forth weigh in favor of reliability of that particular tip. In fact, we don't even know whether it was CW2 or Moniker who made the connection between the description of the shooter and Marcell. It was not clear from the record whether it was Moniker who got the description from CW2 and then said, boy, that sounds like Marcell. I know him. Or whether it was CW2, him or herself. We don't know if they're men or women. We don't know their race. That saw the person and said, that looks like Marcell. That's not right, is it, Mr. Blank? I thought that Inspector Engler knew the families of all of these people by virtue of the fact that they were all from the Bayview-Hunters Point neighborhoods. And we've got an officer who's been on the job for, what, 19 years? Did know them. No history of any truthfulness from them. In fact, knows them through investigation. So the suggestion he'd arrested CW2's brother, had he not. I believe that's correct. Right. So he knew the families. This is not a situation where these people are completely unknown to him. But respectfully, I think the issue, though, is what the record is in front of the district court. And there was, for example, no racial identification as to any of these people. But if he knew the families, he knew their races, didn't he? But that wasn't before. The government did not introduce that. And so we don't know whether the use of the N-word in describing the person was pejorative. It was certainly cross-racial identifications are less reliable. That was withheld for whatever reason from. The real question is, do we know anywhere exactly what CW2 said? No. Or anybody? No. What do you make of the, wasn't there a telephone call that the police listened in on? Tell me your understanding of what was said in that telephone call and whether that supports a reasonable suspicion. It's not clear exactly what was said. But what happened was that the CW1 arranged for a call so that Moniker could then speak and repeat whatever was said before. And the police officer was overhearing that. But it's not reliable in the same ways if Moniker him or herself was talking directly to the police officer because Moniker didn't know that, and this is one of the important issues, that the information was going to a police officer rather than just repeating gossip to CW1. So it wasn't face-to-face. It didn't knowingly reveal the sources. You're asking us to argue that two people who know one another would be less credible with one another than if CW2 knew that he was talking to a police officer. That's exactly what this Court has held. Showing up and talking to a police officer, knowing that you can be held accountable, knowing that you can be prosecuted for making a false statement to that officer is completely different than repeating gossip to a friend that you heard saying, I heard it was, you know, Marcel. We rely on that kind of evidence all the time in wiretaps and consensually recorded conversations between two criminals who are talking to one another and who don't know that the police are listening. I'm not saying you exclude it under the totality of circumstances. I say you have to weigh it and give it the weight that it's due, which is not much, which is not much. I'm running low on time. I do want to talk briefly about Siebert. Even if you look at just the video, this is the classic example of a deliberately delayed interrogation, and here's what happened. The video starts. My king is in the room for a couple minutes. The officers come in, already make reference to an ongoing conversation. In about 15 seconds of talking, Engler stands up, reaches for his wallet, which is where we later learn the Miranda card is, and said, let's just do this real quick. And then you can see, and this is in the record, he thinks better of Mirandizing him at that point, sits back down and asks him a number of questions. One of the questions was a breakthrough question. You know, it's the little questions that get the breakthrough for getting the later confession under these techniques, and that was whether he stayed in the room, God bless you, Your Honor, where the shotgun was found. And Mr. King said, yes. We have a district court finding that this was not a staged or two-step interrogation. We have findings by the trial that we see on the tape before the Miranda warnings are given, in fact, was responding to Mr. King's question about what's going on. That's why I came downtown to the McDonald's near the Hall of Justice to talk with you guys. I want to know what people are saying about me. And the district court found that Inspector Engler was answering that question, saying, this is what I want to talk to you about. I don't think that's in the record that that's what the district court found, Your Honor. I think instead what the district court held is that it wasn't interrogation, and that's a question of law, and it absolutely was interrogation, and here's why. The Supreme Court in Innis says that interrogation is broader than express questioning. It's what is likely to elicit an incriminating response. And the definition of an incriminating response, as this Court held in Padilla, was something that's introduced at trial. And this was introduced at trial. The government insisted on introducing it in the stipulation that we agreed to. But what did they say? They just said, here's where we went, and there's where we went, and here's where we went. No, it's what the issue was, the police had already found the shotgun. So the question of Mr. King's connections to the room where they found the shotgun, that was the whole issue, right? No, the whole issue was did he commit the murder. That's what Inspector Engler is doing. He's a homicide detective. Of course. And that's why Mr. King came down to talk to them voluntarily. But I'm talking about the issue that relates to the shotgun, because they did take that up. And that's what the written confession was about, and that's what this whole case was about. And that was the breakthrough question. And later in my client's declaration. The question is in the transcript. Sure. It's Exhibit Record 473, whether he stayed in the room. The answer is yes. Where did he say whether he stayed in the room? So I'm looking at Exhibit Record 473, and paragraph 5, so it's lines 20 through 23. It says, Inspector Engler says they earlier went to the residence of Mr. King's mother. This is already after they established that he stays predominantly with his girlfriend. And that in the downstairs area, Mr. King's mother pointed out bedrooms where Mr. King stays when he's around and where Mr. King's brother stays when he's around. And Mr. King quietly responds, yes, that's the room where the shotgun was, the one where they respectively said that that's where Mr. King stayed. So that's the significance. That's the breakthrough question. And in my client's declaration. I didn't ask him anything. And I didn't even say, and it just says your mother pointed it out. They didn't say that's where you live. They said that's what your mother said. And he didn't even say yes. He said, mm-hmm. Well, that was a disputed issue of fact. And I should get to the issue, which is that the district court abused its discretion in not having evidentiary when there were contested issues. All right. But we've looked at the videotapes. We have the videotapes. But the videotape doesn't encompass everything that happened. In fact, the government counsel agrees. The court found that the mm-hmm is ambiguous. And we can look at the videotape and see exactly the same thing. So what is an evidentiary hearing going to resolve on the ambiguity of that response? Sure. It's the issue is whether there was something before the videotape, and that was what the factual dispute was about. But you never put in any direct, I mean, the district court criticized you for not putting in any evidence in dispute, either through the form of a declaration from your client, that this is what they said to me before they rolled the videotape. There's none of that before. The district court did criticize me, but the district court was wrong. I did put in the declaration everything my client could have personal knowledge of. And my client wasn't advised when the video began to roll. There's no declaration from your client. There are arguments from his lawyer, which are very good arguments. But unfortunately, they are not evidence. Your Honor, there is a declaration from my client. There were actually two. The first one is a record 482 to 483. And what he says is that they started asking questions about the shotgun as soon as he was put in handcuffs and taken into custody. Which is on the tape. What he doesn't say is, but that's not recorded on the videotape, that it happened before they started rolling the tape. I'm sorry, Your Honor. I'm glad I'm having this chance to clear this up. Even the government counsel in her appellate brief concedes that there was discussions between my client and the police before the videotape started running. Well, we know that they met at the McDonald's. Presumably, they did more than have a hot cup of coffee together. I don't know if they had coffee or not. But the issue is that as soon as he was put in handcuffs, which is upon arriving at the police station before they get to the interrogation room, that's when things started. He was there. If he wanted to say what happened, he could have said what happened. He did say what's happened. He did. He said there was a discussion. He didn't say what was said. He didn't say what he said. He didn't say what anybody else said. It says, As soon as I was taken into custody, the officer started asking me, among other things, about whether I stayed in the bedroom in my mother's house where they found the shotgun. Right. And he doesn't say whether he said yes, no, or maybe, or whether he said I'm not going to talk to you or what he said. He says later on, Since I had already answered questions about that shotgun before the officers advised me of my rights, it seemed to me to be too late to invoke my rights to remain silent. I think you can't read that any other way than saying that this is the admission, the breakthrough admission about the shotgun that led him to sort of give up and say, I felt like I couldn't invoke it later. Counsel, you have way exceeded your time.  Thank you. Thank you. We'll hear from the government. Ms. Mayer. May it please the Court. Suzanne Miles for the United States. I'd like to say, I'd like to start where opposing counsel started with their reasonable suspicion for the search of defendant's residence, his bedroom. And here, putting aside even the hearsay that defense counsel takes issue with, the officers had reasonable suspicion that Mr. King was involved in this homicide. Let's step back up for a minute. We have the Baker case now. We have Judge Graber's concurrent suggestion that we should go on bank. I mean, is there – is the lack of clarity about all this what's creating these kinds of cases in essence? I mean, in the sense that the people – the police officers don't think they need reasonable suspicion. And they just – and so we're going to spend our time trying to find out whether there's a reasonable suspicion. This is at least a close case as opposed to resolving the question. In other words, are they operating on the theory that they don't need reasonable suspicion? That seems to me to be the case. I don't think they are here, Your Honor. I think that the officers – and I think it's evident by the fact of how much investigation these officers did before they ever went to defendants' residence. Kagan did a lot of investigation about who Marcel King was because they had to if they were going to find him. I mean, they weren't really doing investigation in order to develop a reasonable suspicion. They were doing investigation in order to find the guy. That's true, Your Honor. They certainly were doing investigation to find him. But they also had quite a bit of information. Now, I don't quibble with you. I think that if, with the Baker decision fully clarifying that the officers do not need reasonable suspicion, that eliminates some of the cases that would become before this Court. But here, I do think that reasonable suspicion was established. The district court found that. And I think that the officers' investigation established it. So while there's no doubt that they didn't need it, and this Court has clarified that. Kagan, nothing they investigated after they got this tip had anything to do with whether Marcel King shot the guy, right? The tip itself, actually, Your Honor, if I may, the tip itself, and this is just concentrating on CW1. What the officers learned from CW1 is that Marcel King had a motive here against the victim, that they had gotten into a public fight just weeks before the shooting had taken place. And more than that, they found out that King had the opportunity to commit this shooting. CW1 pointed them to the direction of his registered probation address, which was his grandmother's house. They went there, and they found out from his grandmother that he had been there on the night of the shooting, but that he hadn't stayed. And more than that, that the grandmother's house was only five blocks from the place where the shooting had taken place. So going into this investigation, they had clear evidence of both motive and of opportunity. Now, you put on top of that the hearsay information, which they had from CW2 and Moniker, which, Your Honors, are correct, they had every right to be able to rely on in establishing reasonable suspicion. And what you find out is that an eyewitness to this described the shooter as being a man who fits Marcel King's description. By name, he called him Marcel. He said he's the guy that's on the cover of the Bread Me Out album. Bread Me Out is a rap group that's local to that area. And when the police officers went back and looked at, pulled that album cover, looked at him, saw that it was Marcel King who CW1 had given them information about with regard to the motive and the opportunity. So the district court was correct here, that the officers did have reasonable suspicion. Now, you're right, they didn't need it. Kagan. What is the case law about hearsay? How much do you keep saying that? I don't know where the cases are. They say that you could have, presumably, it has to be somewhat reliable hearsay. That's right. It does have to have some semblance of reliability. I think Rollin talks about this when it's talking about CIs and generally TIFs. You're right. I don't have a specific site with regard to hearsay. But the courts, in looking at reasonable suspicion, ask not whether the evidence is admissible, which is what hearsay would speak to, but whether or not it had certain indicia of reliability. And Rollin definitely talks to that with regard to CI TIFs and the indicia of reliability that go along with those. So there is no case saying that hearsay is okay specifically? I wouldn't concede that, Your Honor. I don't have one for you. I certainly can look it up and get one for you. But because the question with regard to reasonable suspicion is not the admissibility of the evidence, but the reliability of it, it's presumed that the hearsay rules simply wouldn't apply. Isn't the seminal case, Draper v. Illinois, that I was questioning Mr. Blank about? That started a whole chain of jurisprudence as to how the police go about corroborating TIFs. And reliability is certainly discussed ad nauseum in those cases. That's correct. And, you know, I haven't read that case specifically for the hearsay question that Judge Berzon is looking at, so I'm hesitant to say that it speaks directly to that. But you're right that Draper certainly talks about reliability. In Draper, as far as I know, in Draper and all the cases, the problem sometimes was the anonymity of the TIF, but the person who claimed to know it claimed to know it firsthand. And here we have not one level. We have three levels. Which is, again, Your Honor, why even putting aside the hearsay, the officers simply had enough.  And I'm not saying that they had enough reasonable suspicion because this guy had had a public fight with the guy who died and was nearby the night of the shooting. That's correct, Your Honor. Really? Yes. And they followed up on that and they did the investigation and did a valid probation search. They ensured that there was a probation clause and did a valid probation search of the mother's home. And, again, as we noted in our briefs, the district court did not address specifically the issue of consent, though that certainly was raised below. And the court found that Mr. King's mother had been thoroughly impeached during the evidentiary hearing with regard to consent. We could fix that. I mean, this whole case could be dealt with if we went back and found out whether there was consent, right? That's correct. And so to the extent that the unfortunate that it wasn't resolved, because we're dealing with a hard question, there might be an easy answer. I'm not sure that the district court agreed. I think that they – I think that the judge also believed that reasonable suspicion was the easiest route here. And, of course, now that Baker is – has been brought down, reasonable suspicion doesn't even need to be answered. I'd like to turn now, if I can, to the issue of the admissibility of Mr. King's confession. Again, here, we have several layers of review that this court could engage in. The first one being that Siebert doesn't even apply here. The district court found that, first of all, there was no pre-Miranda interrogation. There was no pre-Miranda confession. And you need both of those elements in order for either Elstead or Siebert to apply. In order for Siebert to apply, you have to have on top of both an interrogation and a confession a finding that the police withheld Miranda deliberately. And none of those three elements is here. So the review of Mr. King's confession is done – should be done simply under Miranda, which is whether or not that confession was given voluntarily. The district court found that it certainly was. And it looked to several elements, which are clearly on the videotape. Officer Engler reviewed the voluntariness, the right to remain silent many times with Mr. King, even before he administered the Miranda rights. If you look at red brief number 9, which is where the transcript is provided, Officer Engler says to Mr. King before administering Miranda, now, you came here voluntarily. We already covered that. Mr. King says yes. Inspector Engler says at this time, you're not under arrest. Mr. King says yes. Officer Engler says, okay, you're free to talk to us. You're free not to talk to us. But we brought you up here in a pair of handcuffs through the police elevators. Is that correct? Yes. So because we did that, I have to Mirandize you. But again, you have your rights, and I'm not going to force you to say anything. And Mr. King says, I'll talk. I'll say anything that you want to know. Then Officer Inspector Engler goes through each of the Miranda rights one by one, ensures that Mr. King understands them. Mr. King says that he does. And then they go into actually and they don't even talk about the shotgun for the first hour and a half of the investigation, the interrogation. It's not until an hour and a half into the interview, in which time Mr. King, in response to questions about the shooting, says, I haven't touched a gun, I haven't shot a gun in 10 years. And at that point, Inspector Engler says to him, well, what about the gun that's underneath your bed? And it's at that point that they start talking specifically about that shotgun and elicit a clear confession with regard to that. And it's also true, ultimately, that unlike the search issue, that this all partly mattered in terms of how it would play out in a trial, because they went there and the mother said that it was his room and the brother said it was his room, and it's not clear why any of this matters. That's exactly right. I think that's right. There was sufficient evidence with regard to the only the only information that Mr. King gave pre-Miranda was that he had access to that room, that that was his room. And that was established, you're right, Your Honor, by other evidence, by his mother, his brother, his father was there. That fact was clearly known and clearly provable at that point. It was possession of the gun and actual control over that gun, because it's important to keep in mind, too, that Mr. King's room in his mother's home was accessible by many people, his mother, his brother, his father. So it was his actual possession of the gun was the real confession here, and that was post-Miranda. It was voluntary, and the district court found that. Unless Your Honors have any other questions. I think we don't. Thank you. Thank you. We would ask you to affirm. Mr. Blank, you used a lot more than your time, but you may have one minute for rebuttal. On this last issue, the question of whether the error, if there was one, is harmless is an argument that may be waived if not brought by the government. It was not brought by the government. It was waived. At a minimum, the court should have suppressed the pre-Miranda statement. It did not, and instead, over my objection, the government introduced it. So at a minimum, that should have happened. The issue about consent, I think, speaks volumes of the fact that the judge didn't rule on that, and the government would have you believe that it's because the court thought that my client's mother was severely impeached. It's not the case. It would have been very easy for him to hold that she was impeached and she had given consent. The issue was saying that a very well-respected officer didn't tell the truth, and it's obvious that the court went out of its way to not do that. Well, the only thing he says is because the holding on reasonable suspicion is dispositive, the order did not reach the issue of whether there was a valid consent. That's the only thing he says on the subject. It was a very lengthy evidentiary hearing that the court said and didn't need if that's the basis that the court was going to do it on. I'm out of time. Thank you very much, Your Honor. Thank you. The case just argued is submitted, and we appreciate the arguments of both counsel.
judges: Graber, Berzon, Tallman